25909. DEUTSCH *et al. v.* HAAS *et al.*

DECIDED MARCH 11, 1937.

*Tye, Thomson & Tye,* for plaintiffs in error.

*Herbert J. Haas, Joseph F. Haas, Bertram S. Boley, Sidney Parks, Harold Hirsch, Marion Smith, A. S. Clay, Pope F. Brock,* contra.

SUTTON, J. Herbert J. Haas brought suit against Eberhard P. Deutsch, Leonard B. Levy, and Fulton National Bank, alleging that the bank held on deposit the sum of $19,000, of which $10,000 was due to the plaintiff and $9000 due to the defendants Deutsch and Levy, the same being a sum awarded to the three individuals as attorneys' fees by the United States district court for the northern district of Georgia, for representing the trustee of bondholders and bondholders of J. P. Allen & Company, a business located in the City of Atlanta, in connection with certain bankruptcy proceedings instituted against that company. It was alleged that pending the litigation, during the trial of the case, Deutsch and Levy procured an offer of settlement, which included attorneys' fees, and which was finally approved by the court, and that the court ordered the sum of $19,000 to be paid as attorneys' fees; that the plaintiff demanded of Deutsch and Levy $10,000 as the

reasonable value of his services (which were set forth in substance in the petition and will be referred to more in detail hereinafter), and that they refused to pay more than $7600; that Deutsch, Levy, and the plaintiff then deposited the $19,000 fee with the Fulton National Bank as stakeholder, pending the determination of the amount due each of them. He prayed for a judgment of $10,000 with interest, and that such judgment be declared a first and special lien on the fund of $19,000 and be paid therefrom. Deutsch and Levy answered, admitting that the sum on deposit was the property of themselves and the defendant Haas, but setting up that only $7600, or 40 per cent. of the amount of the fee, was due to Haas, because his services were rendered under an express agreement with them under which he was to receive such a percentage of the total fee collected.

The evidence on the hearing was substantially as follows: After preliminary conferences, Haas was engaged, on April 30, 1934, to join Deutsch and Levy in instituting ordinary bankruptcy proceedings against J. P. Allen & Company of Atlanta. This company had defaulted in the payment of certain outstanding bonds, and offers of settlement had been made but not accepted. S. M. Grier & Company of New York was the owner of the entire capital stock of J. P. Allen & Company, and, before Haas became associated with Deutsch and Levy, had offered $25,000 in cash and $100,000 in bonds to the other bondholders, most of whom finally became represented by Deutsch and Levy. In addition to owning some of the bonds, S. M. Grier & Company was asserting a claim of $244,000 as a creditor of J. P. Allen & Company, and in the contemplated proceedings it was desirable, on behalf of the bondholders in general, to eliminate or considerably reduce the claim which S. M. Grier & Company asserted. Haas was to devote himself first to interesting some capital in Atlanta to bid at the sale in connection with the proposed bankruptcy proceedings, and, having obtained prospective bidders, then to file the proceeding, it being contemplated that he was to shoulder most of the work to be done in Atlanta. It was intended, however, that there was to be different representation of the parties to the proceeding, but as Haas was to do most of the work in preparing the case, he was to receive 40 per cent. of the attorneys' fees to be awarded Deutsch, Levy, and Haas in representing their clients. Efforts to interest

capital in Atlanta were somewhat obstructed by inability to obtain financial statements of the condition and operating experience of J. P. Allen & Company, but Haas was successful in producing two parties who indicated an intention to bid if data could be obtained. Following the sale, reorganization was to take place. On June 7, 1934, Congress enacted an amendment to the national bankruptcy laws, and by section 77-B thereof provided for reorganization of corporations without a sale ·of assets; that is, a reorganization from within, which would permit the continuance of business under the provisions therein stipulated. When Haas learned of this amendment, he communicated with his associates, recommending that the proceeding be instituted under such amendment, explaining why he thought it more advantageous to the bondholders, and that after the filing of the petition it would be possible, under the direction of the court, to make audits of J. P. Allen & Company and provide the Atlanta capital with data which they desired, and by retaining their interest hold them in readiness to bid in the event the plan of reorganization from within did not meet the approval of the court and a sale of the property should take place. It was also recommended as affording, after the filing of the petition, an opportunity to acquire data with which to attack the Grier claim, the elimination or reduction of which was very important to the bondholders' interest. Grier had asserted a claim almost equal to that of the bondholders; and since a two-thirds vote of all creditors would be necessary to approve any reorganization plan, if the bondholders were to control the reorganization, it was apparent that the Grier claim would have to be removed or curtailed.

This plan of proceeding under section 77-B of the amendment was approved by Deutsch and Levy, and Haas spent much time for many months in preparing for the trial of the case, and investigation of facts and legal research beyond the necessities of the first contemplated action had to be given close and extended attention. Furthermore, instead of there being separate representation of various parties in the bankruptcy court, a larger portion fell upon Haas when the case came on for trial in February, 1935, and was conducted for seventeen days by Haas. Levy had been prevented from attending because of illness, but Deutsch was present for three days. Haas, by investigating the records of J. P.

Allen & Company, had ascertained certain facts with reference to the claim of Grier, which, with an extensive brief of the law he and his office force had prepared, he counted on to eliminate or reduce that claim in the proceeding, and he had also filed objections to some claims filed by others. After proceeding with the case as stated above, he learned that Deutsch had resumed negotiations with Grier for a settlement of the bondholders' claim, and thereupon remonstrated, pointing out that since the work of getting up evidence, construing the new act, and developing the legal issues had been done by him, he was in better position to judge and evaluate the rights of the bondholders than either Deutsch or Levy. He further stated that he opposed any settlement at a time when the case was proceeding very favorably for the bondholders, and that from the rulings of the court it appeared as if the bondholders would recover one hundred cents on the dollar or at least more than fifty cents. Deutsch and Levy continuing to negotiate with Grier through his counsel, Haas advised that he thought a suspension of the trial desirable, and expressed his fear of being unable to keep the Atlanta capital interested. He also advised them that if they made any settlement he would expect to be paid $10,000 as attorney's fees for the reasonable value of his services, and would consent to a settlement only on that basis. Nevertheless a settlement was made, under which S. M. Grier & Company paid $171,000 for the benefit of the bondholders, as against an offer of $25,000 in cash and $100,000 in bonds when Haas first came in the case, an increase of $46,000. Haas succeeded in having $19,000 attorneys' fees awarded by the United States district court, no division among the attorneys, Deutsch, Levy, and himself, being specified in the order.

On the hearing of the present suit three reputable lawyers, in answer to a hypothetical question outlining the work done by counsel, testified as to the reasonable value of the services rendered by Haas, one testifying that he should be entitled to from 50 to 66⅔ per cent. of the total fee, another from 60 to 65 per cent., and the third from 60 to 66⅔ per cent. The plaintiff testified, that, the fee of $19,000 having been fixed, he should be allowed two thirds of the total. The court rendered judgment holding that the provisions of the original agreement should not apply, and allowed the plaintiff $9000, ordering that such amount should

be paid to him out of the fund held by the bank, and that the defendants Deutsch and Levy be each paid $5000. Error is assigned on the admission in evidence of the testimony of the plaintiff as to the reasonable value of his services, and to the judgment allowing him $9000 as his share of the fee, it being contended that such services were rendered under an express contract whereby he was to receive 40 per cent. of the total fee collected, or $7600, and that if not governed by such contract the fee arose as a result of a joint undertaking under which the plaintiff would be entitled to receive only one third of the fee, or $6333.33.

■ Where non-resident attorneys engaged a local attorney to join with them in representing certain bondholders of a corporation in this State, which had defaulted in the payment of its bonds at maturity, it being understood that involuntary bankruptcy proceedings would be instituted against the corporation in the United States district court for the northern district of Georgia, and there was to be various representation of the bondholders in such proceeding, but that the local attorney was to do most of the preliminary work and to endeavor to interest local capital to be ready to bid at the sale of the assets of the corporation in such proposed involuntary bankrupty proceeding, it being agreed between the attorneys that the local attorney would receive 40 per cent. of the total fees collected; but where the local attorney met with difficulty in interesting capital because of inability to obtain financial and operating statements of the corporation, the stock of which was owned by a non-resident holding corporation, which was also asserting a large claim as a creditor of the defaulting corporation, and between which and the bondholders represented by the attorneys, the parties hereto, there had been some unsuccessful efforts looking to a sale of the bondholders' interest; and where, after the amendment on June 7, 1934, to the national bankruptcy laws, under which, by section 77-B, provision was made for reorganization of corporations in the Federal courts without a sale of assets, permitting the continuance of the business under conditions named in the amendment, the local attorney recommended to his associates that the original plan of instituting involuntary bankruptcy proceedings be abandoned, and proceedings be instituted under said section 77-B of the amendment to the national bankruptcy laws, explaining that thereby it would be possible, un-

der the direction of the court, to have audits made of the defaulting corporation and provide the prospective capital with desired data to enable them to bid at the sale of the assets of the corporation, in the event that the plan of reorganization within the corporation did not meet with the approval of the court and a sale of the assets should take place, explaining also that thereby an opportunity would be afforded to acquire in advance data with which to attack the claim asserted by the adverse interest, the elimination or reduction of which was important to the bondholders' interest, in order to control the reorganization of the corporation; and where such proposal was acquiesced in by the nonresident attorneys and the local attorney spent months in preparing the case for trial, in the investigation of facts and legal research far beyond the necessities of the original plan; and where, when the case came on for trial, the local attorney spent seventeen days in conducting the same, one of the non-resident attorneys being present only three days, and the other absent all the time, and at such stage of the proceedings the local attorney learned that his associates, without advising him and without his concurrence therein, were privately negotiating with the adverse interest for a settlement, and he thereupon remonstrated with them against such settlement at that time, insisting that the case was proceeding very favorably to the bondholders with a prospect of their recovering 100 per cent. of their claims, and that because of the work done by him he was in a better position to judge and evaluate the rights of the bondholders than the non-resident attorneys, and further advising them that if they persisted in making settlement he would expect to be paid $10,000 as attorney's fees for the work done by him and would consent to a settlement only on that condition; and where a settlement was made over his protest, under which the bondholders received from the adverse interest $46,000 more than had been offered before the local attorney came into the case, and the court awarded joint fees of $19,000 which sum was deposited in a bank to await adjustment of the contentions of the parties as to how they should share therein; and where, in the present suit upon a quantum-meruit basis, experienced and reputable lawyers gave as their opinion that the services of the local attorney, the plaintiff therein, were reasonably worth from one half to two thirds of the total fee awarded

jointly, in consideration of the work done by him, the plaintiff also testifying that such services were worth two thirds of the amount awarded as fees, and the court, to whom the case was submitted without a jury, rendered judgment for the plaintiff, the local attorney, in the sum of $9000: *Held,* that under the evidence it was shown that the original contract between the parties negatived the idea of any joint adventure, and that such contract, under which the local attorney was to receive 40 per cent. of the fees collected, was abandoned by all parties, and a new plan of procedure under section 77-B of the amendment to the national bankruptcy laws, which procedure was not in contemplation of the parties when the first agreement was entered into, was adopted by all of the parties without any agreement as to how the fees should in that case be divided between them, and that the services performed by the local attorney were different and more onerous in volume and responsibility than the work to be done under the original agreement; and under the evidence the court was authorized to find that for the services actually performed by the local attorney he was reasonably entitled to receive $9000 out of the total amount of fees awarded jointly by the district court of the United States. "Ordinarily, when one renders services or transfers property valuable to another, which the latter accepts, a promise is implied to pay the reasonable value thereof." Code, § 3-107. Accordingly, the judgment will not be disturbed.

■ The court did not err in permitting the plaintiff, an experienced and reputable attorney, to testify as to the quantum meruit value of his services.

*Judgment affirmed. Stephens, P. J., and Felton, J., concur.*